J-S36011-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KEVIN J. GETCHIUS | : | |
| | : | |
| Appellant | : | No. 71 MDA 2019 |

Appeal from the PCRA Order Entered December 21, 2018
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s):  CP-36-CR-0002492-2013

BEFORE:   PANELLA, P.J., SHOGAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PANELLA, P.J.:                **FILED JUNE 02, 2020**

Appellant, Kevin J. Getchius, appeals from the order entered in the Lancaster County Court of Common Pleas denying his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. In his petition, Appellant alleges trial counsel's ineffectiveness. On appeal, Appellant also challenges the PCRA court's assessment that he is subject to lifetime registration requirements under Megan's Law II, 42 Pa.C.S.A. §§ 9791-9799.7. We affirm in part and, based on our Supreme Court's recent decision in **Commonwealth v. Butler ("Butler II")**, 25 WAP 2018, ___ A.3d ___, 2020 WL 1466299 (Pa., filed March 26, 2020), reverse in part.

_____

[*] Retired Senior Judge assigned to the Superior Court.

Appellant was arrested after his ex-girlfriend's daughter, K.H., revealed to her grandmother that Appellant had sexually abused her a few years earlier. K.H. was four or five years old at the time of the abuse, which she alleged occurred during times Appellant babysat her while her mother was at work.

A jury convicted Appellant of one count each of rape of a child, involuntary deviate sexual intercourse with a child, unlawful contact with a minor, dissemination of explicit sexual materials, and corruption of a minor, and two counts of indecent assault of a child. The trial court sentenced Appellant to an aggregate 23–46 years' incarceration on August 6, 2014. Following a hearing on that same date, the court determined Appellant to be a sexually violent predator ("SVP") and therefore subject to lifetime registration requirements under then-effective Megan's Law III, 42 Pa. C.S.A. §§ 9791-9799.9.

Appellant timely appealed to this Court, which vacated his judgment of sentence and remanded for a new sentencing hearing due to the court's imposition of a mandatory minimum sentence in violation of *Alleyne v. United States*, 570 U.S. 99 (2013). The sentencing court again imposed an aggregate 23–46 years' incarceration on Appellant and also required him to register for life as an SVP under the registration legislation in effect at that

time, the Sexual Offenders Registration and Notification Act ("SORNA I"), 42 Pa.C.S.A. §§ 9799.10-9799.41.[1] Appellant did not appeal from that judgment of sentence.

Appellant thereafter filed a *pro se* PCRA petition. The PCRA court appointed counsel, who filed an amended petition alleging trial counsel's ineffectiveness and arguing Appellant should not be subject to an SVP designation or SORNA I registration requirements. The court denied Appellant's ineffectiveness claims, but agreed with Appellant that his classification as an SVP was invalid following this Court's decision in **Commonwealth v. Butler** ("**Butler I**"), 173 A.3d 1212 (Pa. Super. 2017), and that the lifetime registration requirements that had been imposed on him under SORNA I were unconstitutional following **Commonwealth v. Muniz**, 164 A.3d 1189 (Pa. 2017).

The court, however, disagreed with the Commonwealth that Appellant was therefore subject to the registration requirements of "Act 10" and "Act

---

[1] SORNA I specifically provided for the expiration of prior registration requirements, *i.e.* Megan's Law III, as of its effective date of December 20, 2012. **See Commonwealth v. Wood**, 208 A.3d 131, 134 (Pa. Super. 2019).

29" of 2018 (collectively "SORNA II"), 42 Pa. C.S.A. §§ 9799.10-9799.75.[2]

Instead, the court determined that Appellant was subject to lifetime registration requirements under Megan's Law II. Appellant timely filed a notice of appeal, and complied with the dictates of Pa.R.A.P. 1925(b). This matter is now properly before us.

Before we are able to address the merits of Appellant's issues, we must determine whether his petition was timely filed.

A PCRA petition is timely if it is filed within one year of the date the petitioner's judgment of sentence becomes final. *See* 42 Pa.C.S.A. § 9545(b)(1). "A judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." *Commonwealth v. Callahan*, 101 A.3d 118, 122 (Pa. Super. 2014) (citation omitted).

Here, a previous panel of this Court vacated Appellant's judgment of sentence and remanded for a new sentencing hearing. Following that remand,

---

[2] The Pennsylvania General Assembly enacted Act of Feb. 21, 2018, P.L. 27, No. 10 §§ 1-20, immediately effective ("Act 10"), and then amended Act 10 and reenacted it as Act of June 12, 2018, P.L. 140, No. 29 §§ 1-23, immediately effective ("Act 29").

the sentencing court imposed a term of 23–46 years' incarceration. Appellant did not appeal following the imposition of the new sentence. As a result, his judgment of sentence became final on November 22, 2015, thirty days after the court imposed Appellant's new sentence, when his time for filing a notice of appeal to this Court expired. **See** Pa.R.A.P. 903(a). Appellant's PCRA petition, filed on November 4, 2016, is therefore timely.

We proceed to the merits of Appellant's petition. "Our standard of review for issues arising from the denial of PCRA relief is well-settled. We must determine whether the PCRA court's ruling is supported by the record and free of legal error." **Commonwealth v. Presley**, 193 A.3d 436, 442 (Pa. Super. 2018) (citation omitted). In doing so, we read the record in the light most favorable to the prevailing party. **See Commonwealth v. Ford**, 44 A.3d 1190, 1194 (Pa. Super. 2012). If this review reveals support for the PCRA court's credibility determinations and other factual findings, we may not disturb them. **See Commonwealth v. Henkel**, 90 A.3d 16, 20 (Pa. Super. 2014). We, however, afford no deference to the PCRA court's legal conclusions. **See id**.

In his first two issues, Appellant argues trial counsel rendered ineffective assistance. We presume counsel's effectiveness and Appellant bears the

burden of proving otherwise. ***See Commonwealth v. Brown***, 161 A.3d 960, 965 (Pa. Super. 2017). "In order for Appellant to prevail on a claim of ineffective assistance of counsel, he must show, by a preponderance of the evidence, ineffective assistance of counsel which so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." ***Presley***, 193 A.3d at 442 (citation omitted).

To establish ineffectiveness of counsel, he must plead and prove: his underlying legal claim has arguable merit; counsel's actions lacked any reasonable basis; and counsel's actions prejudiced him. ***See Commonwealth v. Spotz***, 18 A.3d 244, 260 (Pa. 2011). Failure to satisfy any prong of the ineffectiveness test requires dismissal of the claim. ***See Commonwealth v. O'Bidos***, 849 A.2d 243, 249 (Pa. Super. 2004). "Arguable merit exists when the factual statements are accurate and could establish cause for relief. Whether the facts rise to the level of arguable merit is a legal determination." ***Commonwealth v. Barnett***, 121 A.3d 534, 540 (Pa. Super. 2015) (citations and internal quotation marks omitted). Appellant must also establish that he suffered prejudice, "that is, that counsel's ineffectiveness was of such magnitude that it could have reasonably had an adverse effect on the outcome

of the proceedings." ***Commonwealth v. Spotz***, 84 A.3d 294, 315 (Pa. 2014) (citation and quotation marks omitted).

Appellant's first claim of ineffectiveness is based upon his belief that the Commonwealth failed to specify when his assault of K.H. occurred. Appellant indicates that the Commonwealth gave a range of dates, from May 1, 2010 to May 1, 2011, on which it alleged the assaults may have occurred. According to Appellant, he was unable to investigate possible alibis or other defenses due to the long timespan, which resulted in a denial of due process of law. Further, Appellant says that while the Commonwealth claimed the acts happened more than once in that span, he objects to any label of his actions as a continuous course of conduct that would justify the lengthy range. In Appellant's view, counsel's failure to object or seek a dismissal of the charges based on this length of time at issue was ineffective assistance resulting in manifest prejudice to Appellant's case. We disagree, as this claim has no arguable merit.

> It is the duty of the prosecution to fix the date when an alleged offense occurred with reasonable certainty…. The purpose of so advising a defendant of the date when an offense is alleged to have been committed is to provide him with sufficient notice to meet the charges and prepare a defense.

*Commonwealth v. Brooks*, 7 A.3d 852, 857-858 (Pa. Super. 2010) (citations and internal quotations omitted).

However, this Court has previously noted that "due process is not reducible to a mathematical formula[.]" *Commonwealth v. Riggle*, 119 A.3d 1058, 1069-1070 (Pa. Super. 2015) (citation omitted). Instead, the considerations "vary with the nature of the crime and the age and condition of the victim, balanced against the rights of the accused." *Commonwealth v. Benner*, 147 A.3d 915, 920 (Pa. Super. 2016) (citation omitted).

Moreover, the Commonwealth is to be afforded "broad latitude when attempting to fix the date of offenses which involve a continuous course of criminal conduct." *Id*. at 921. (citation omitted). In cases with young sexual abuse victims, the Court has found that due process considerations are satisfied where the victim "can at least fix the times when an ongoing course of molestation commenced and when it ceased." *Commonwealth v. G.D.M., Sr.*, 926 A.2d 984, 990 (Pa. Super. 2007).

Here, K.H. testified at trial that she knew Appellant because he lived with her family in Lancaster. *See* N.T. Trial, 4/8/14, at 68. K.H. explained that she was four or five years old at the time of the relevant incidents. *See id*. at 71. K.H. repeatedly stated Appellant abused her more than once during the

time she stayed in the Lancaster apartment. *See id*. at 71, 79. K.H. was able to describe the apartment and the room where Appellant abused her. *See id*. at 79-80, 84. K.H. described exactly what the abuse entailed, including forced oral and vaginal contact. *See id*. at 68-71. K.H. also affirmed that her mother was at work each time Appellant abused K.H. *See id*. at 72.

The Commonwealth then supplied testimony from K.H.'s mother, who confirmed that she and K.H. began living with Appellant in Lancaster around May of 2010. *See id*. at 95. K.H.'s mother stated she and K.H. moved out of the apartment in October of 2010, but that they often came back to visit and stay overnight with Appellant until Appellant moved out of the apartment in 2011. *See id*. at 95-97. K.H.'s mother testified she worked while living in Lancaster, and had often asked Appellant to pick up K.H. from daycare and watch her at the apartment. *See id*. at 97.

Here, the Commonwealth supplied a range of dates, between May 2010 and May 2011, when the abuse allegedly occurred. The Commonwealth provided testimony from K.H. that the abuse happened repeatedly during that time. K.H. was extremely young, only four or five years old at the time of the abuse. K.H.'s specificity as to where and when the abuse occurred allowed the Commonwealth to fix a date range for when it happened. Appellant has not

established that he was deprived of due process because the nature of this case rendered the Commonwealth unable to more precisely specify the timing of his continuous course of conduct. As counsel cannot be deemed ineffective for declining to pursue a meritless claim, Appellant is due no relief on this issue.

Appellant's second ineffectiveness claim is based on his contention that the nurse who examined K.H., Mary Twomey, exceeded the scope of her expertise when she testified that K.H.'s normal colposcopic examination results did not preclude the existence of sexual trauma. Appellant contends only an expert physician would have been qualified to testify about the significance of K.H.'s test results. Further, Appellant asserts Twomey's testimony was hearsay, as she cited peer-reviewed studies for the truth of the matter asserted. He concludes trial counsel unreasonably failed to object to Twomey's qualification as an expert witness, and to her inadmissible testimony. Once again, we conclude this claim fails for a lack of arguable merit.

The trial court has discretion in deciding to admit expert testimony, and this Court will not reverse that decision absent an abuse of discretion. **See Commonwealth v. Huggins**, 68 A.3d 962, 966 (Pa. Super. 2013). "An

expert's testimony is admissible when it is based on facts of record and will not cause confusion or prejudice." *Id*. (citation omitted). "[T]he standard for qualifying an expert witness is a liberal one: the witness need only have a reasonable pretension to specialized knowledge on a subject for which expert testimony is admissible." ***Commonwealth v. Doyen***, 848 A.2d 1007, 1014 (citation omitted).

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

This Court has recognized a hearsay exception where an expert witness testifies about the opinion or data of other professionals, so long as the expert also incorporates his own knowledge and judgment. ***See Nazarak v. Waite***, 216 A.3d 1093, 1108 (Pa. Super. 2019).

> There is no question that if published material is authoritative and relied upon by experts in the field, although it is hearsay, an expert may rely upon it in forming his opinion; indeed, it would be

unreasonable to suppose that an expert's opinion would not in some way depend upon the body of works preceding it. Pennsylvania courts have thus permitted, subject to appropriate restraint by the trial court, limited identification of textual materials (and in some circumstances their contents) on direct examination to permit an expert witness to fairly explain the basis for his reasoning.

*Aldridge v. Edmunds*, 750 A.2d 292, 297 (Pa. 2000) (citations omitted).

Finally, we note that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Pa.R.E. 704.

At trial, the Commonwealth called Mary Twomey to testify. *See* N.T. Trial, 4/8/14, at 128. Twomey stated she was a pediatric nurse practitioner working at the Children's Resource Center in Harrisburg. *See id*. She averred that, in addition to her bachelor's and master's degrees in nursing, she also completed an advanced course of training specifically for clinicians examining children who have suffered from physical and sexual abuse. *See id*. at 129. Twomey asserted she had worked in the Resource Center for ten years, and had examined between 300–400 children each year. *See id*. at 130. Appellant's counsel declined to ask Twomey any questions, and did not object to her qualification as an expert. *See id*.

Twomey testified that K.H.'s examination was "healthy." *Id*. at 134. Twomey then clarified that though the results were normal, most child victims

of sexual assault have healthy exam results, and such a result does not make it less likely that the child was sexually assaulted. *See id*. at 135. Twomey affirmed that, while it may seem logical that an abuse victim alleging penetrative sexual contact would have an abnormal test result, such thinking had been disregarded in the field since the year 2000. *See id*. Twomey began to state that since 2000, peer-reviewed studies had changed the assessments of experts before Appellant's counsel objected. *See id*. at 136.

At sidebar, counsel protested that he had not been given any information about peer-reviewed studies in discovery. *See id*. The court held that Twomey was entitled to explain how she reached her opinion about K.H.'s examination, and overruled Appellant's objection. *See id*. at 137. Twomey continued, stating that research has shown it is uncommon for child victims of sexual abuse to show signs of penetration when they are not examined immediately after the sexual contact. *See id*. at 138. Twomey continued that her own experience has borne out this research, and that she had not expected to find any signs of abuse during K.H.'s examination. *See id*. Twomey conceded that she could not form an opinion about whether K.H. was abused based on the examination. *See id*.

Appellant offers nothing to support his derisive assertion that Twomey was merely a "zealot" rather than a properly qualified expert. Appellant's Brief, at 20. Though Appellant asserts Twomey was unqualified to render an opinion as to the significance of K.H.'s examination results, as she was not a physician, he offers no reason why a nurse practitioner specializing in child abuse cases would be unqualified to testify about what the results of a child abuse examination meant.

Twomey's testimony that she had conducted approximately 3,000–4,000 child sexual abuse examinations over her tenure at the Children's Resource Center, and had completed an advanced course of study specifically pertaining to child sexual abuse, demonstrates a level of specialized knowledge. Her testimony was presented to assist the jury in understanding that a child's "healthy" result following a sexual abuse examination does not preclude a possibility the child has been assaulted. Moreover, Appellant does not offer any argument that Twomey's methodology was somehow flawed. Rather, her testimony that the examination results were inconclusive clearly favored Appellant's defense, as he acknowledges in his brief. **See** Appellant's Brief at 18, n 4. Because the trial court acted well within its discretion by

permitting Twomey to testify as an expert, we cannot conclude the PCRA court erred in finding a lack of arguable merit.

As for Appellant's claim that Twomey's brief reference to "peer-reviewed studies" constituted hearsay, this argument is also meritless. In her testimony, Twomey referred to studies showing that child sexual abuse victims rarely show signs of having been abused when the examination occurs well after the sexual contact. Twomey affirmed that she has found this to be true in her own extensive experience conducting examinations of child abuse victims. She explained for that reason, she did not anticipate that she would find anything abnormal in K.H.'s exam since it took place well after the conduct alleged. Twomey's testimony was clearly of the type anticipated by the hearsay exception allowing an expert witness to explain the basis for her reasoning. Once again, we cannot conclude the PCRA court erred in rejecting this claim.

Appellant's final claim is not an ineffectiveness claim. It involves the legality of his sentence and more specifically, which legislation, if any, can lawfully be relied upon to impose registration requirements on him as a designated SVP. Appellant asserts that the PCRA court properly determined

that subjecting him to SORNA II's registration requirements would constitute an *ex post facto* violation under **Muniz**.

He argues, however, that the PCRA court erred by then concluding that he was subject to lifetime registration requirements pursuant to Megan's Law II. According to Appellant, there are *no* registration requirements that can legally be imposed on him. We disagree. Instead, we find that our Supreme Court's recent decision in **Butler II** compels the conclusion that Appellant is subject to the registration requirements applicable to SVPs under SORNA II.

Our review of the legality of Appellant's sentence is *de novo*, and our scope of review is plenary. **See Muniz**, 164 A.3d at 1195. In **Muniz**, the Pennsylvania Supreme Court determined the retroactively amplified reporting requirements of SORNA I, when applied to offenders who committed crimes prior to SORNA I's effectiveness date, constituted increased punishment in violation of the *ex post facto* prohibitions in the United States and Pennsylvania Constitutions. **See id.** at 1223. Shortly thereafter, a panel of this Court in **Butler I** deemed SORNA's SVP determination procedure unconstitutional. **See Butler I**, 173 A.3d at 1217.

The SVP procedure under SORNA I dictated that the trial court find the relevant facts by clear and convincing evidence before concluding whether a

defendant is required to register as an SVP, rather than submitting those facts to the fact-finder to determine beyond a reasonable doubt. *See id*. *Butler I* found the procedure "violates the federal and state constitutions because it increases the criminal penalty to which a defendant is exposed without the chosen fact-finder making the necessary factual findings beyond a reasonable doubt," in violation of *Alleyne*. *Id*. at 1218 (footnote and citation omitted). The *Butler I* court held that a trial court could no longer designate defendants as SVPs or hold SVP hearings until the legislature enacted a constitutional procedure for SVP designation. *See id*.

In response to *Muniz* and *Butler I,* the Pennsylvania General Assembly passed SORNA II as a replacement for the invalidated portions of SORNA I. *See Commonwealth v. Bricker*, 198 A.3d 371, 375 (Pa. Super. 2018). The legislation divided sex offender registrants into two distinct subchapters. *See id*. at 375-376. Subchapter H applies to "individuals who committed a sexually violent offense on or after December 20, 2012, for which the individual was convicted." 42 Pa.C.S.A. § 9799.11(c). Subchapter I applies to individuals, like Appellant, who committed a sexually violent offense "on or after April 22, 1996, but before December 20, 2012, whose period of registration with the Pennsylvania State Police … has not expired[.]" 42 Pa.C.S.A. § 9799.52(1).

- 17 -

It was against this backdrop that the PCRA court in the instant case concluded that the retroactive application of SORNA I's registration requirements to Appellant was invalid under **Muniz** and that Appellant's SVP status was unconstitutional pursuant to this Court's decision in **Butler I**. The court then sought to determine what Appellant's registration requirements were in the wake of these two decisions.

The PCRA court first rejected the Commonwealth's argument that Appellant should be subject to the lifetime registration requirements under SORNA II. In doing so, the court concluded that SORNA II's registration provisions could not be applied retroactively to Appellant without violating the constitutional prohibition against *ex post facto* laws because those provisions were, in the PCRA court's view, punitive in nature.

The court reached this conclusion after conducting the "two step analysis which considers whether the legislature's intent was punitive and if not, whether the statute's effect or purpose is so punitive as to negate the stated non-punitive intent." PCRA Court Opinion at 16, *citing* **Muniz**, 164 A.3d at 1208. As for the first step, the PCRA court accepted the Pennsylvania General Assembly's explicit statement that SORNA II is non-punitive. However, after analyzing the seven factors listed in **Kennedy v. Mendoza-Martinez**, 372

U.S. 144 (1963), to determine whether legislation is sufficiently punitive in effect so as to override the legislature's stated intent, the PCRA court concluded that the factors weighed in favor of finding that the registration requirements of SORNA II were indeed punitive.[3]

Given its conclusion that it could not constitutionally apply SORNA II's registration requirements to Appellant, the PCRA court turned to the legislation that set forth the applicable registration requirements at the time of Appellant's offenses, Megan's Law III. The PCRA court found, however, that it could not direct Appellant's registration under Megan's Law III because that legislation had been invalidated by **Commonwealth v. Neiman**, 84 A.3d 603

_____

[3] The factors enumerated in **Mendoza-Martinez** include:

> (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment—retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.

**Commonwealth v. Abraham**, 62 A.3d 343, 351 (Pa. 2012) (citations omitted).

(Pa. 2013). Unable to rely on Megan's Law III, the court instead found Appellant subject to registration under Megan's Law II on the theory that in cases where an act repeals its predecessor and is later found to be unconstitutional, the repealed act will not be considered repealed absent evidence that the legislature intended to rescind it without providing a substitute. *See* PCRA Court Opinion, at 27 (stating that as "the last prior law not held unconstitutional, Megan's Law II[ ] will not be treated as repealed.").

Following the PCRA court's decision and Appellant's appeal of that decision to this Court, our Supreme Court issued its opinion in *Butler II*, which reversed this Court's determination that the designation procedure for SVPs was unconstitutional. In doing so, the *Butler II* Court announced at the outset of its analysis that "SVPs are different from the non-SVP SORNA registrants at issue in *Muniz*." 2020 WL 1466299 at *10. The Court found, in the first instance, that the Pennsylvania General Assembly intended for the registration requirements applicable to SVPs in SORNA II to be non-punitive. The Court then conducted an analysis using the *Mendoza-Martinez* factors to determine whether those registration requirements had a punitive effect and concluded that, on balance, the registration requirements as applied to

SVPs did not constitute criminal punishment. ***See Butler II***, 2020 WL 1466299 at \*12-\*16.

In reaching its conclusion that the registration requirements as applied to SVPs were non-punitive, the Supreme Court repeatedly emphasized the heightened public safety concerns regarding SVPs, who have been "individually determined to suffer from a mental abnormality or personality disorder such that they are highly likely to continue to commit sexually violent offenses." ***Id***. at \*15. The Court therefore found that because the registration requirements for SVPs were not punitive, the procedure for designating individuals as SVPs was constitutionally permissible. ***See id***. at \*16.

***Butler II*** is dispositive of the instant case. Appellant was determined to be an SVP, a designation specifically upheld as constitutional by ***Butler II***. ***See id.*** at \*10. The ***Butler II*** Court was also clear in its determination that the lifetime registration requirements applicable to SVPs in SORNA II are not punitive in nature and do not amount to criminal punishment. ***See id.*** at \*16. As such, contrary to what the PCRA court found and what Appellant continues to argue, subjecting Appellant to the registration requirements applicable to SVPs under SORNA II does not constitute a violation of the constitutional prohibition against *ex post facto* laws. ***See Muniz***, 164 A.3d at 1208 (stating

that *ex post facto* claims depend upon a finding that the sanctions at issue constitute criminal punishment).

Accordingly, while we agree with Appellant that he is not subject to registration under Megan's Law II, it is because SORNA II applies to him instead. Appellant was determined to be an SVP. Based on **Butler II**, we conclude that Appellant is therefore subject to the SVP registration requirements of SORNA II and remand to the PCRA court to inform Appellant of those requirements.[4]

Order affirmed in part and reversed in part. Remanded for the PCRA court to issue revised notice of Appellant's registration requirements consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/2/2020

---

[4] As noted above, Appellant's relevant offenses occurred in 2010 and 2011. Appellant is therefore subject to the SVP registration requirements contained in subchapter I of SORNA II. **See** 42 Pa.C.S.A. § 9799.52(1).